*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

WILLIAM GARY HELMER,

Defendant-Appellant.

FOR PUBLICATION
March 26, 2026
1:07 PM

No. 369063
Wayne Circuit Court
LC No. 19-009596-01-FC

Before: MALDONADO, P.J., and M. J. KELLY and TREBILCOCK, JJ.

TREBILCOCK, J.

"Welcome to hell, bitch." That is what defendant, William Gary Helmer, said right before he lit his ex-girlfriend on fire using gasoline. He committed that heinous act with revenge on his mind: "I wanted her to be burned and suffer like she made me suffer." The flames caused extensive injuries; she was hospitalized for several months and is now permanently disfigured. Defendant appeals his jury conviction for assault with intent to murder, raising several issues concerning the trial court's handling of his self-representation, along with the sufficiency of the evidence supporting his conviction. We affirm.

## I. RELEVANT FACTS AND PROCEDURAL HISTORY

Dorothy Spinella met defendant in 2018, and they moved in together shortly thereafter. Their relationship was turbulent, and they eventually broke up. According to Spinella, she moved on because defendant "was getting violent" and she "was afraid of him."

Defendant's assaultive burning of Spinella occurred about a month after she ended the relationship. She was working as a waitress at a Redford Township restaurant on that fateful night. Defendant called her several times during her shift, but she did not answer because she "was done with the relationship." After completing her shift, she exited the restaurant's back door to wait for her ride home. She heard a voice say "bitch," and was then "doused with some liquid and lit on fire." Spinella recognized the voice as defendant's and looked "right in his face."

Officers obtained numerous pieces of evidence linking defendant to the scene. They found his phone. Officers also located a gas can and a charred coffee container, and forensic

-1-

examinations tied defendant's DNA to each. Spinella identified defendant to a responding police officer as the one who attacked her. And defendant's own sister admitted that he told her, "I'm going to kill that bitch because she's taunting me."

The fire caused extensive and permanent injuries to Spinella. She was in a medically induced coma for three months with burns on forty percent of her body from the waist up. Her movement is now forever limited due to the tightness of her skin, she has tunnel vision, and her eyes are partially sewn shut. At trial, the jury viewed pictures of her from before the attack, demonstrating how her burns transformed her appearance.

A significant portion of the evidence admitted at trial were defendant's own words, with a primary source being his nearly two-hour-long taped confession to police officers. Through that video, jurors learned intimate details about their relationship, like its emotional toll on defendant and how angry he was with her. He casually described her as "the most horrible person I have ever met in my life" and detailed how she "hurt" and "publicly humiliate[d] him," and had "just destroyed [his] fucking soul." Several times over, defendant detailed just how much he wanted to take vengeance on her, stating he wanted to "show her [he] fucking mean[s] business," "wanted that bitch to suffer," "wanted to get back at her," and "wanted to make her pay." Defendant even got his sister to communicate to Spinella his violent—and in his words, "street justice"—approach to retribution: "I had my little sister call her and tell her . . . 'he'll walk up in your house and fucking shoot up all you motherfuckers. He don't care if there's kids there or not. If you're fucking with him, he will kill you.' " And he unremorsefully confirmed for officers what he told Spinella right before striking his lighter: "Welcome to hell, bitch."

Defendant's testimony largely tracked his confession to officers. He admitted that he poured gas into a Folger's can, waited for her to come out of the restaurant's back door, threw the gasoline on her, and then lit her on fire. He did so intending to cause her pain, knowing that she could be severely injured. But, according to defendant, he "didn't want her to die" and instead just "wanted her to be burned and suffer like she made [him] suffer." He also claims he conspired with Spinella and her friend for him to intentionally burn her so that they could "secure money from GoFundMe accounts."

Based on these and other facts, a jury convicted defendant of assault with intent to commit murder, in violation of MCL 750.83. The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, and imposed a 40- to 80-year sentence of imprisonment. Defendant appeals as a matter of right.

## II. THE SIXTH AMENDMENT AND THE RIGHT TO SELF-REPRESENTATION

Defendant represented himself at trial. On appeal, he claims the trial court did not adequately permit him to do so. More specifically, he asserts the trial court did not follow the procedures set forth in *People v Anderson*, 398 Mich 361; 247 NW2d 857 (1976), and MCR 6.005(D), which ensure a defendant "knowingly, intelligently, and voluntarily" waives his constitutional right to counsel as guaranteed by the Sixth Amendment. We disagree.

## A. ADDITIONAL FACTS CONCERNING WAIVER OF COUNSEL

Before trial, defendant expressed concerns with his counsel's performance and moved to represent himself. The trial court granted that motion in a pretrial conference after engaging in a colloquy with defendant. We set forth that lengthy exchange to help demonstrate that the trial court's handling of defendant's request was not with haste:

> THE COURT: And so Mr. Helmer, do you understand--put your hand down--do you understand that you're entitled to a lawyer's assistance in all subsequent court proceedings, sir?
>
> DEFENDANT HELMER: Yes, ma'am.
>
> THE COURT: Do you understand that if you want a lawyer and are financially unable to retain one, one would be appointed for you at public expense?
>
> DEFENDANT HELMER: Yes, ma'am.
>
> THE COURT: All right. Mr. Helmer, you're aware that you're charged in the Information with 1 count of assault with intent to murder which carries a maximum penalty of life or any number of years, 1 count of domestic violence, aggravated; there's a 2nd offense notice which enhances the penalty to 5 years. The People have also filed an habitual offender 4th offense notice, mandatory 25 year sentence. Do you understand that, sir?
>
> DEFENDANT HELMER: Yes, ma'am, and I'd like to challenge that Information 'cause there's information--
>
> THE COURT: Upon conviction sir, if you're convicted as charged your minimum sentence would be 25 years. Do you understand that, sir?
>
> DEFENDANT HELMER: Yes, ma'am.
>
> THE COURT: So you understand the risk of self-representation?
>
> DEFENDANT HELMER: Yes, ma'am.
>
> THE COURT: All right, and I will give you an opportunity to consult with Mr. Greenwood [(his then-attorney)] at this time.
>
> * * *
>
> DEFENDANT HELMER: Your Honor, first I'd like to apologize to this court and to Mr. King [(the prosecutor)] if I've acted in any way out of line. I have experience in the law, and if you would allow it, Mr. Greenwood to be a standby attorney to assist me because there's certain things I can't do in jail, but the representation of--I mean I've successfully represented myself before, . . . .

THE COURT: So Mr. Helmer after consulting with counsel it's still your desire to represent yourself?

DEFENDANT HELMER: Yes, ma'am.

THE COURT: All right. Can you tell me what's the highest grade you completed?

DEFENDANT HELMER: I went to college. I have an Associate's Degree. I went to college.

THE COURT: All right, and have you represented yourself before?

DEFENDANT HELMER: Yes, ma'am.

THE COURT: How many times?

DEFENDANT HELMER: 3.

THE COURT: And were they in federal-

DEFENDANT HELMER: Yes, ma'am.

THE COURT: Strike that. Were they felony matters--

DEFENDANT HELMER: 1 was a fel--

THE COURT: -- or misdemeanors?

DEFENDANT HELMER: 1 was a felony and 2 were were federal court.

THE COURT: Did any of those matters go before a jury?

DEFENDANT HELMER: Yes, ma'am.

THE COURT: All right. What was the outcome?

DEFENDANT HELMER: I was acquitted.

THE COURT: All right. Why is it your desire to represent yourself in this matter?

DEFENDANT HELMER: Well because during this whole covid thing I'm having a problem with getting the, the discovery which I feel that I really need to defend myself in this case, and I, I just can't see going to trial with an attorney that I haven't even talked to about my case. I'm, I'm sure you can understand that.

THE COURT: No, you definitely have a vested interest in the matter--

DEFENDANT HELMER: Yes, ma'am.

THE COURT: -- more than anyone in this courtroom this morning

DEFENDANT HELMER: Yes, ma'am.

THE COURT: So I can understand why you're anxious and why you want to make sure that you have everything that you believe you're entitled to.

DEFENDANT HELMER: Yes, ma'am.

THE COURT: All right.

DEFENDANT HELMER: You had asked me the last time in court about the discovery that I was missing, and I told you I'm-- so I went back and filed a request, and I have proof of services that I sent it to the prosecutor, the court, and certain things I know I mandatory have to be given like, I'll just off the top of my head the--

THE COURT: Let me continue with my questions Mr. Helmer, please.

DEFENDANT HELMER: All right.

THE COURT: So understand that the *2* counts that you're charged with, the prosecutor has the burden of proof of proving the elements of both offenses. There are criminal procedures and rules of evidence.

DEFENDANT HELMER: Yes, ma'am.

THE COURT: Jury instructions, jury selection, issues that need to be preserved for appeal if things don't go the way that you expect them to go, and self-representation is almost always un-wise, do you understand that, sir?

DEFENDANT HELMER: Yes, ma'am.

THE COURT: It's like a surgeon performing surgery on himself.

DEFENDANT HELMER: Yes, ma'am, but--

THE COURT: No, do you understand that, sir?

DEFENDANT HELMER: Yes, ma'am, I understand that.

THE COURT: And you will receive no special treatment and can receive no help from the court, do you understand that, sir?

DEFENDANT HELMER: Yes, ma'am, I sure do.

THE COURT: Mr. King is an experienced trial attorney who is unlikely to give you any special consideration in light of the fact that you're representing yourself, do you understand that, sir?

DEFENDANT HELMER: Yes, ma'am.

THE COURT: And you will receive no special help from the court staff and you will be expected to follow the same requirements that apply to practicing lawyers, do you understand that, sir?

DEFENDANT HELMER: Yes, ma'am, that would be the Michigan Rules of Evidence, Michigan Court Rules; I'm familiar with them.

THE COURT: All right, Mr. King has the court complied with MCR 6.005?

MR. KING: Yes, Your Honor.

THE COURT: All right. The court's going to find that the waiver is knowingly, intelligently, and voluntarily made, it's unequivocal, and the defendant understands the disadvantage of self-representation, and self-representation will not disrupt, unduly inconvenience, or burden the court.

At several times thereafter before trial, the trial court reaffirmed its findings.

## B. WAIVER OF COUNSEL OVERVIEW

The Sixth Amendment to the United States Constitution, as incorporated against the States by the Fourteenth Amendment, guarantees the right to assistance of counsel at all critical stages of criminal proceedings. US Const, Ams VI and XIV; see also *Marshall v Rodgers*, 569 US 58, 62; 133 S Ct 1446; 185 L Ed 2d 540 (2013). Those amendments also "grant[] to the accused personally the right to make his defense." *Faretta v California*, 422 US 806, 819; 95 S Ct 2525; 45 L Ed 2d 562 (1975). The Michigan Constitution similarly protects the right to counsel and the right to self-representation. Const 1963, art 1, §§ 13 and 20; see also *People v King*, 512 Mich 1, 11; 999 NW2d 670 (2023).

Although a court may not "force a lawyer upon a defendant," it may grant a defendant's self-representation request only after ensuring the defendant knowingly, voluntarily, and intelligently waived the right to counsel. *Iowa v Tovar*, 541 US 77, 87-88; 124 S Ct 1379; 158 L Ed 2d 209 (2004) (quotation marks and citation omitted). Our Supreme Court has held this means making two related inquiries. *King*, 512 Mich at 11.

First, the trial court must make three findings under *Anderson*, 398 Mich at 367-368:

(1) the defendant's request to represent themselves is unequivocal, (2) the defendant is asserting the right knowingly, intelligently, and voluntarily after being informed of the dangers and disadvantages of self-representation, and (3) the defendant's self-representation "will not disrupt, unduly inconvenience and burden the court and the administration of the court's business." [*King*, 512 Mich at 11-12, quoting *Anderson*, 398 Mich at 368.]

Second, the trial court must comply with MCR 6.005(D)'s requirement that it "may not permit the defendant to make an initial waiver of the right to be represented by a lawyer without first":

-6-

(1) advising the defendant of the charge, the maximum possible prison sentence for the offense, any mandatory minimum sentence required by law, and the risk involved in self-representation, and

(2) offering the defendant the opportunity to consult with a retained lawyer or, if the defendant is indigent, the opportunity to consult with an appointed lawyer. [*King*, 512 Mich at 12.]

Although these findings under *Anderson* and MCR 6.005(D) are required, our Supreme Court has emphasized trial courts need not conduct a "litany approach"; "substantial compliance" is the touchstone for our review. *People v Russell*, 471 Mich 182, 191; 684 NW2d 745 (2004). This "nonformalistic nature" means the trial court must "discuss the substance of both *Anderson* and MCR 6.005(D) in a short colloquy with the defendant, and make an express finding that the defendant fully understands, recognizes, and agrees to abide by the waiver of counsel procedures." *People v Adkins*, 452 Mich 702, 726-727; 551 NW2d 108 (1996), abrogated on other grounds by *People v Williams*, 470 Mich 634; 683 NW2d 597 (2004).

Finally, the right to counsel "is a fundamental right that cannot be forfeited and is preserved absent a personal waiver." *King*, 512 Mich at 14 (quotation marks and citation omitted). This Court reviews de novo whether a defendant validly waived his right to counsel, but in so doing, defers to the trial court's factual findings regarding whether the waiver was knowing and intelligent absent clear error. See *Williams*, 470 Mich at 640-641.

C. ANALYSIS

Defendant contends on appeal that his waiver of counsel was not knowing, intelligent, or voluntary because he "was not told that self-representation . . . was a bad idea, and that the court made no express finding that he fully understood, recognized and agreed to abide by the waiver of counsel procedures." The record contradicts this assertion. We hold that the trial court, at the very least, *substantially* complied with the requirements set forth in *Anderson* and MCR 6.005(D).

Taking the *Anderson* factors first, there is no disputing defendant unequivocally made a self-representation request (*Anderson* factor one) and that the trial court determined his self-representation would not disrupt, unduly inconvenience or burden the court (*Anderson* factor three). Concerning whether defendant knowingly, intelligently and voluntarily waived his right to counsel following being advised of the dangers and disadvantages of self-representation (*Anderson* factor two), we discern no clear error in the trial court's determination that he did. As the extensively quoted colloquy makes clear, defendant was educated; had successfully represented himself before; and knew (a) it was "unwise" ("like a surgeon performing surgery on himself"), (b) trial required special skills to adequately preserve issues for appeal, (c) the prosecutor was an experienced trial attorney, and (d) neither the court nor its staff would help him. The trial court's colloquy more than adequately demonstrates substantial compliance with the *Anderson* factors. So too for those set forth in MCR 6.005(D)—the trial court initially advised defendant of his charges, the maximum sentence, and the risks associated with self-representation and made sure that defendant understood he could consult with a retained or appointed attorney. MCR 6.005(D)(1).

Defendant sees it differently, largely faulting the trial court for not conducting a word-for-word incantation of a California Court of Appeals decision that this Court block quoted in *People v Blunt*, 189 Mich App 643, 649-650; 473 NW2d 792 (1991), which sets forth "suggestions" for how to make a defendant aware of self-representation risks, see *People v Lopez*, 71 Cal App 3d 568, 572-573; 138 Cal Rptr 36 (1977). But no Michigan caselaw commands that a trial court must engage in such a rote exercise—what marks the mandated waiver-of-counsel finding is not compliance with so-called "model inquir[ies]" and "the trial court's express advice but rather the defendant's understanding" through "a colloquy on the record between the judge and the defendant." *People v Dennany*, 445 Mich 412, 431; 519 NW2d 128 (1994) (quotation marks and citation omitted).

Finally, to the extent defendant asserts the trial court did not adequately comply with MCR 6.005's subsequent-proceedings provision, we cannot agree. After a defendant waives assistance of a lawyer, MCR 6.005(E) requires confirmation of the waiver at subsequent proceedings—"[T]he record of each subsequent proceeding . . . need show only that the court advised the defendant of the continuing right to a lawyer's assistance . . . and that the defendant waived that right." This is not a constitutional requirement. *People v Lane*, 453 Mich 132, 140; 551 NW2d 382 (1996). But if, during those proceedings, a trial court concludes "the defendant no longer clearly understands the options afforded to him, and the disadvantages of each," then it "should once again engage in the extensive *Anderson* litany . . . ." *Id*. at 138.

Defendant has not directed us to anything in the record establishing the trial court's subsequent proceedings ran afoul of MCR 6.005(E). Nor do any of the record facts raise questions about defendant no longer understanding his rights, thus requiring the trial court to conduct another fulsome affirmation of defendant's waiver. And even if otherwise, we discern no reversable error given the strength of the trial court's initial waiver determination, and the lack of an articulable assertion by defendant that any failure prejudiced him in some way. *Id*. at 140-142.

For these reasons, we reject defendant's "litany approach" arguments, *Russell*, 471 Mich at 191, and hold the trial court did not deprive defendant of his constitutionally guaranteed right to counsel.

### III. VOIR DIRE

Defendant next raises an issue with voir dire, which the trial conducted itself. Voir dire permits the trial court and parties to discover bias and other information that would render a potential juror incompetent to serve. *People v Jendrzejewski*, 455 Mich 495, 509; 566 NW2d 530 (1997). In defendant's view, the trial court's questions were not specific enough to allow him to discover information about each of the prospective jurors, thus limiting his ability to exercise peremptory challenges.[1] He did not raise this issue before the trial court, so we review it for plain

---

[1] He did not object below to the trial court's decision to solely conduct voir dire, and does not claim here that the decision to do so under MCR 6.412(C), in and of itself, reflected an abuse of discretion, see *People v Tyburski*, 196 Mich App 576, 582; 494 NW2d 20 (1992), or violated his right to self-representation, see, e.g., *McKaskle v Wiggins*, 465 US 168, 174; 104 S Ct 944; 79 L Ed 2d 122 (1984).

error. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).

Defendant, however, leaves us wanting as to what questions to which prospective jurors he stakes this claim upon. Rather, he baldly proclaims that the trial court elicited "general" "yes or no answers" and did not follow up on any "red flags, such as domestic violence." That is not enough to demonstrate error, let alone one that is plain. See *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998) ("An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority.").

The one question he does say the trial court should have asked "was whether they had a problem with [him] representing himself." That failure does not constitute plain error—on thorough review of the trial court's questioning of potential jurors, the record makes clear that the trial court (and defendant) informed potential jurors that defendant was representing himself and gave them an opportunity to provide "any reason why . . . Mr. Helmer wouldn't want you to sit on this jury." With that, we cannot agree that the trial court plainly erred in failing to elicit "enough information so that the court itself can make an independent determination of a juror's ability to be impartial." *People v Tyburski*, 445 Mich 606, 620; 518 NW2d 441 (1994).

## IV. CROSS-EXAMINATION LIMITS

Before trial, the prosecutor moved to prevent defendant from personally cross-examining Spinella under MRE 611(a)(3), which grants a trial court the power to "exercise reasonable control over the mode and order of examining witnesses . . . so as to protect witnesses from harassment or undue embarrassment." The motion asserted Spinella "expressed extreme emotional trauma from the incident," and thus requested that the trial court "order that cross examination be authored by defendant in writing and be read to the witness by way of Defendant's standby attorney." The trial court granted that motion, and defendant's standby counsel questioned Spinella at trial using questions prepared by defendant. On appeal, defendant contends this violated his Sixth Amendment rights to self-representation and to confront witnesses. We disagree.

"The right of cross-examination is not without limit . . . and may bow to accommodate other legitimate interests of the trial process or of society." *People v Adamski*, 198 Mich App 133, 138; 497 NW2d 546 (1993). MRE 611(a) is one such valid proscription, permitting a trial court to use its trial-management authority to "limit the defendant's cross-examination to protect the witness from 'harassment or undue embarrassment.' " *People v Daniels*, 311 Mich App 257, 268; 874 NW2d 732 (2015). This Court reviews such a decision for abuse of discretion. *Id*. at 265.

The trial court did not err, let alone abuse its discretion, by preventing defendant from personally cross-examining Spinella. As interpreted by *Daniels*, MRE 611(a) permits a trial court "to prohibit a defendant from personally cross-examining vulnerable witnesses. . . ." 311 Mich App at 268. Spinella was understandably that, with the prosecutor rightly expressing significant concern that allowing defendant to personally question her "would subject her to undue trauma, embarrassment, and harassment."

Defendant reads *Daniels*—a case that involved allegations of child sex abuse—as limited to the facts of that case by highlighting its statement that MRE 611(a)'s limitation applies

"particularly" to "children who have accused the defendant of committing sexual assault." *Id.* at 269. But that it might "particularly" apply in that circumstance cannot mean it does not cover any other scenario. To the contrary, MRE 611(a)(3) broadly protects all "harassment or undue embarrassment." Disallowing defendant to personally question Spinella after what he admittedly did to her in the name of "street justice" is exactly the type of protection for witnesses contemplated by MRE 611(a). Defendant's claim on appeal on this issue is without merit, and the evidentiary rule is not as limited as he suggests.

## V. SUFFICIENCY OF THE EVIDENCE

The last issue on appeal concerns whether sufficient evidence supports defendant's conviction for assault with intent to murder under MCL 750.83.

"This Court reviews de novo defendant's challenge to the sufficiency of the evidence." *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011). We "review the evidence in the light most favorable to the prosecutor and determine whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Bailey*, 310 Mich App 703, 713; 873 NW2d 855 (2015) (quotation marks and citation omitted). "Circumstantial evidence and the reasonable inferences that arise from that evidence can constitute satisfactory proof of the elements of the crime." *People v Blevins*, 314 Mich App 339, 357; 886 NW2d 456 (2016). "The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *Bailey*, 310 Mich App at 713 (quotation marks and citation omitted).

"To prove assault with intent to murder, the prosecution must show (1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder." *People v Anderson*, 322 Mich App 622, 632; 912 NW2d 607 (2018) (quotation marks and citation omitted). The only element at issue here is whether defendant acted with intent to kill Spinella. "Because of the difficulty in proving an actor's intent, only minimal circumstantial evidence is necessary to show that a defendant had the requisite intent," *People v Stevens*, 306 Mich App 620, 629; 858 NW2d 98 (2014), which may be inferred from all facts in evidence, *Carines*, 460 Mich at 759.

Viewing the evidence in a light most favorable to the prosecution, we hold that there was sufficient evidence from which a rational trier of fact could find beyond a reasonable doubt that defendant intended to kill Spinella. Simply, defendant "snapped" (to use his words) and sought revenge through "street justice"; so, he doused Spinella with an accelerant, announced "Welcome to hell, bitch," lit her ablaze, and fled, leaving her to her own devices to survive. That is enough to deduce intent to murder, for any rational juror would understand that intentionally and vitriolically setting a person on fire and then leaving without intervention could reflect an intent for that person to die. Cf. *People v Long*, 246 Mich App 582, 590; 633 NW2d 843 (2001).

Defendant says he just wanted to hurt—but not kill—Spinella. But the jury could rationally find that self-serving view of the events not credible. The jury viewed defendant's videotaped confession, observed his demeanor during his trial testimony, saw Spinella describe his violent proclivities and her fear of him, learned he said "I'm going to kill that bitch because she's taunting me," and heard that he got his sister to warn Spinella that "[i]f you're fucking with him, he will kill you." And while defendant says in retrospect he "used too much gas," the jury was free to

give that no credence based on his other rancorous statements and his admitted flight away from the restaurant instead of taking any action to mitigate what he claims after-the-fact was a mistake.

In sum, the facts presented at trial more than suffice for a reasonable juror to infer that defendant intended for Spinella to die when he lit her on fire.

## VI.  CONCLUSION

For these reasons, we affirm the trial court's judgment.

/s/ Christopher M. Trebilcock
/s/ Allie Greenleaf Maldonado
/s/ Michael J. Kelly